Scileppi, J. (dissenting).
The child (now three years old) who is the subject of the instant proceeding was born out of wedlock as a result of an interracial conjugation.
The sole question presented is whether it is in the best interests of the child to leave custody with the mother or to grant the petition and award custody to the putative father.
While there is great conflict in the testimony of the parties as to the fitness of the mother, certain facts are not in dispute. The parties met in 1965 while both were working for the Port Authority of New York. Shortly thereafter they commenced the illicit relationship which resulted in the birth of the child in. July, 1966. The father testified that after being informed that respondent was pregnant, he immediately asked her to marry him. The respondent, however, thought it would be *741 too embarrassing because everyone would know she was pregnant before she got married. The appellant then tried to get a marriage certificate indicating that the date of the marriage was prior to conception. After this attempt to save face proved unsuccessful, the appellant continued his proposal of marriage but the respondent said, “ I can’t get married now, I have a belly, everybody will see it; it will be embarrassing. After the baby is born then we’ll get married. ”
After the baby was born, the appellant again asked respondent to marry him but he testified she again refused stating: “ ‘ Well, I don’t know, I don’t know anymore if I want to get married. I don’t want to tie myself down. ’ I says, ‘ But you have a son; you have two children, ’ * I said, ‘ What are you going to do, make both of them illegitimate?’ She says, ‘ I can’t think now; I need more time.’ ”
As to the parties’ illicit relationship, the appellant testified that it continued long after the child was born.
Sometime in 1967 the respondent decided that she wanted to go back to work. The appellant strongly objected since it would require leaving the child with someone during the day. He testified: “ I was opposed to it. I says, 1 Why should you go back to work; we can get married; there’s no reason, the child is too young to be left with anybody.’ She said, that’s what she’s going to do, and that’s what she did.”
The respondent lived with her mother in a private home in Jamaica, New York. After the respondent began her new job, every working day the respondent, her mother (who also worked) and the respondent’s two illegitimate children would leave their Jamaica home at approximately 7:30 a.m. and travel to Harlem. The older child would be dropped off at the school he attended on 125th Street and then the trip would be continued to the respondent’s grandmother’s apartment on 117th Street; The grandmother would take care of the child during the day and then along with the older child he would be picked up in the evening by the respondent and her mother for the journey back to Queens.
In describing the Harlem apartment, the appellant testified that it was a five or six-room apartment on the top floor of an elevated building. There were several people residing there *742 (including another illegitimate child) and that his principal objection to the child’s being left there was that several of the residents were dealing in narcotics. As to the respondent herself, he stated that before and after the baby was born she was using pills and marijuana. In order to corroborate the appellant’s testimony, an unsigned note was introduced stating: “I’ve got the c—t. Have you-got tie pills?” On the basis of handwriting comparisons the court found that the respondent had written the note.
The only other physical evidence introduced bearing on the question of fitness were 12 pornographic pictures of the respondent posing in the nude. The appellant testified that he did not take these pictures.
The respondent’s testimony was in substance a denial of all the allegations.
She testified that she wanted to get married but that the appellant gave her the ‘ ‘ run around ’ ’ by saying he was already married. With regard to narcotics she testified she has never taken any and as to the note she denied having written it. As to the pornographic pictures she testified that the appellant forced her to pose for them. She stated: “ We were at a motel at the time, and you know, he asked me to pose for him in the nude. I says, No, I don’t want to,’ but he says, ‘ Well after all, I want something if we’re going to get married. I would like to have something that no one else has had,’ because he had never let me forget the idea that I wasn’t a virgin when I met him, and he said he wanted to have these pictures of me, you know, whenever we went [sic] near each other; he could always have them to look at, and I posed for them for him. And since that time, I’ve been blackmailed with these same pictures. ’ ’
In addition to the testimony of the parties, the appellant’s mother testified as to the environment the child would live in and the care he would receive should the court award custody to her son. -She stated that she resides in an apartment in the Bronx together with her son (the appellant) and her daughter. Although the mother testified that she is presently working for the telephone company, she would, if custody were granted to her son, terminate her employment to devote her full attention to the child. She stated that she loves the child very much *743 and is physically able to take care of a child of such tender years. (At the time of the hearing she testified she was 55 years old.)
At the close of the hearing, Special Term concluded upon the basis of all the evidence that the interests of the child would best be served by granting the petition and awarding custody to the putative father. The court stated:
“ The court has given careful consideration to several factors in arriving at its determination-—(1) the morality and character of the parties—(2) all of the abiding circumstances including the moral atmosphere, physical and moral environment of their respective homes—(3) respondent’s mode of living and particularly her dual residence arrangement and its effect on the boy—(4) the fact that the child is in care of its great-grandmother the greatest part of the time and thus is without the respondent’s care and attention, and, lastly but most important of all—(5) the welfare and best interests of the child.
‘ ‘ Upon all of the testimony and proof in the record and upon weighing all of the circumstances set forth above, and always with the general welfare and best interests of the child for the present and in the unforeseeable but hopeful future playing a predominant role in these considerations, the court finds that respondent should be relieved of the custody of the child. In the court’s opinion, the petitioner is best able and suited to provide such care as will best guard, promote and insure the boy’s mental, moral and physical development. (Whittmore v. Whittmore, 202 Misc. 175.) The court finds that the respondent is not a proper and suitable person to care for the child in light of the existing circumstances, her mode of living and its impact on the boy and bis welfare. As stated in Ex parte Travis (126 N Y S 2d 130, 132): i The life and conduct of this father and mother are pertinent as to their respective fitness to meet the opportunities and obligations inherent in custody and as to the character of the home each holds out to their son. ’
“ In the court’s opinion the boy’s welfare and best interests will be better served — and he will be happier—with the petitioner and his mother in petitioner’s home, as against the dual residence arrangement of the respondent with its upsetting travail of daily commuting from Queens to Manhattan and *744 back to Queens. Upon all of the proof, the court is convinced that petitioner is better able to provide for the child’s material and substantive needs — and most important—will provide a better moral influence and moral environment for the boy. The latter’s interests and welfare will best be guarded and promoted in petitioner’s custody. (Schmidt v. Schmidt, 24 A D 2d 685.)
“Although it must be acknowledged that there can be no ideal solution to the problems inherent in cases of this kind, the court finds that the best interests and welfare of the child compel the conclusion that custody be awarded to the petitioner-father and the court so directs.”
The Appellate Diyision unanimously reversed and dismissed the writ thereby leaving custody of the child with the mother. They concluded: ‘ ‘ When she is a proper and suitable person, the mother of an illegitimate child is prima facie entitled to custody (People ex rel. Meredith v. Meredith, 272 App. Div. 79, affd. 297 N. Y. 692). It is the duty of the court to look primarily to the child’s welfare and interests when the question of custody is raised (People ex rel. Meredith v. Meredith, supra). ‘ Generally, children of tender years should be awarded to the mother ’ (Sheil v. Shiel, 29 A D 2d 950; see, also, Ullman v. Ullman, 151 App. Div. 419). In our opinion, there was no substantial basis in the record for Special Term, to have awarded custody of the two-year old infant, an illegitimate child of an interracial conjugation, to respondent (see Bunim v. Bunim, 298 N. Y. 391, 393). The proof failed to sustain the contentions that appellant is not a proper and suitable person to care for the infant and that the welfare of the infant will be better served by residence with respondent and his (respondent’s) mother. To sustain these contentions respondent sought to establish a multiple of circumstances to support the conclusion that taking the infant from his present and maternal custody was warranted. The proof submitted by respondent, however, largely consisted of self-serving statements, unsupported by any other evidence, and was completely rebutted by appellant’s denials or explanations.”
It is my opinion that the Appellate Division erred in reversing the findings of Special Term.
While it is true that in more recent years we have evidenced a preference for the findings made by the Appellate Division, *745 we have neverthéless remained constant in our preference for the original trier of the facts when, as in the instant case, the issue is principally one of credibility (see Cohen and Karger, Powers of the New York Court of Appeals, § 112). As was stated in Boyd v. Boyd (252 N. Y, 422, 429): “Face to face with living witnesses, the original trier of the facts holds a position of advantage from which appellate judges are excluded * * # To the sophistication and sagacity of the trial judge the law confides the duty Of appraisal * * * His was the opportunity, the responsibility and the power to decide.” And as was stated in People ex rel. Herzog v. Morgan (287 N. Y. 317, 322): 1 ‘ The Special Term judge saw and heard the witnesses, He was face to face with the infants whose paramount interests were to be fostered. The factors that made his duty clear to him can at this distance be seen by us only, as it were, through a glass darkly. Our conclusion is that in all human probability the first-made findings of the Special Term are attested by the weight of the evidence. ’ ’
Although it is true that in the instant case both parties were equally responsible for bringing the child into the world out of wedlock, Special Term properly took into consideration the conduct of the parties thereafter in determining what was in the best interests of the child. It is my opinion that, unless there was no evidence upon which to sustain the original trier’s determination, even if that determination had been to leave custody with the mother, its findings should not have been disturbed. Of course, the belief of appellant’s testimony, the pornographic and suggestive pictures of the respondent and the written note indicating a desire to exchange sex for narcotics, are manifestly sufficient to formulate the basis of the findings by Special Term.
I would merely add that both Special Term and the Appellate Division erroneously took the position, citing People ex rel. Meredith v. Meredith (272 App. Div. 79, affd. 297 N. Y. 692) that the mother of an illegitimate child is prima facie entitled to custody.
Section 70 of the Domestic Relations Law provides that: “ In all cases there shall be no prima facie right to the custody of the child in either parent, but the court shall determine solely what is for the best interest of the child, and what will *746 best promote its welfare and happiness, and make award accordingly.” (emphasis added).
The respondent, however, without citing any authority, has urged and apparently successfully in the courts below that section 70 only contemplates the rights and obligations of parents of children born of lawful wedlock and is not applicable to the facts presented herein. This argument is without merit for there is nothing in the legislative history of the statute to justify the drawing of such a distinction. In fact the history of the statute- would seem to indicate just the contrary for, in 1964, the statute was amended, changing the phrase ‘ ‘ A husband or wife ” to its present form of “ either parent ”, thus indicating the application of the statute to a proceeding determining custody of a child born in or out of wedlock.
Therefore, even if I agreed with the majority’s preference for the findings of the Appellate Division, I would nevertheless reverse and remand for a reconsideration of the case without a presumption of custody in favor of the mother being applied.
Accordingly, the order of the Appellate Division should be reversed and the judgment of Supreme Court, Special Term, Queens County, should be reinstated.
Order affirmed, etc.

 Respondent had another illegitimate child when she was 15 years old. At the commencement of this action, that child was eight years old.